### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. _____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

      Plaintiff,

v.

VAIL RUN RESORT COMMUNITY ASSOCIATION, INC., d/b/a VAIL RUN RESORT; and
GLOBAL HOSPITALITY RESORTS, INC.,

      Defendants.

---

### COMPLAINT AND JURY TRIAL DEMAND

---

### <u>NATURE OF THE ACTION</u>

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* ("Title VII"), and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, to correct unlawful employment practices on the basis of sex and national origin, and to provide appropriate relief to Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals who were adversely affected by such practices.  As alleged with greater particularity below, the United States Equal Employment Opportunity Commission ("Plaintiff" or the "Commission") alleges that Defendants Vail Run Resort Community Association, Inc., and Global Hospitality Resorts, Inc., (collectively "Vail Run Resort") engaged in unlawful discrimination by creating a hostile work environment based on sex and national origin (Mexican), and by retaliating against those who complained about or otherwise opposed the discrimination, or participated in an investigation or other proceeding under Title VII.

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343 and 1345. This action is authorized and instituted pursuant to Sections 703(a), 706(f)(1), and (3) of Title VII, 42 U.S.C. §§ 2000e-2(a), 2000e-5(f)(1), and 2000e-5(f)(3), and by Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a.

2.      The employment practices alleged to be unlawful were and are now being committed within the jurisdiction of the United States District Court for the District of Colorado.

## PARTIES

3.      Plaintiff is the agency of the United States of America charged with the administration, interpretation and enforcement of Title VII, and is expressly authorized to bring this action by Sections 706(f)(1) and 706(f)(3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and 2000e-5(f)(3).

4.      Since at least 2011, Defendant Vail Run Resort Community Association, Inc., ("Vail Run Resort Community Association"), a Colorado corporation, has been registered and actively conducting business in the State of Colorado, and has a registered agent in Colorado.

5.      Since at least 2011, Defendant Vail Run Resort Community Association has employed at least fifteen (15) employees.

6.      Since at least 2011, Defendant Vail Run Resort Community Association has been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

7.     Since at least 2011, Defendant Global Hospitality Resorts, Inc., ("Global Hospitality"), a Colorado corporation, has been registered and actively conducting business in the State of Colorado, and has a registered agent in Colorado.

8.     Since at least 2011, Defendant Global Hospitality, in its own right or by virtue of an integrated enterprise with Vail Run Resort Community Association, has employed at least fifteen (15) employees.

**<u>Single Integrated Enterprise, Alter-Ego, and/or Joint Employers</u>**

9.     Since at least 2011, William Fleischer and/or Gritt Fleischer wholly-owned Defendant Global Hospitality.

10.     Since at least 2011, William Fleischer and/or Gritt Fleischer served as President of and managed Defendant Global Hospitality.

11.     Since at least 2011, William Fleischer managed Defendant Vail Run Resort Community Association.

12.     Since at least 2011, William and/or Gritt Fleischer wholly-owned Fleischer Enterprises, Inc. ("Fleischer Enterprises"), a Colorado corporation.

13.     Since at least 2011, William and/or Gritt Fleischer managed Fleischer Enterprises.

14.     Since at least 2011, Vail Run Resort Community Association has had its principle office address at 1000 Lions Ridge Loop, Vail, Colorado, 81657.

15.     Since at least 2011, Global Hospitality has had its principle office address at 1000 Lions Ridge Loop, Vail, Colorado, 81657.

16.     Since at least 2011, Fleischer Enterprises has had its principle office address at 1000 Lions Ridge Loop, Vail, Colorado, 81657.

3

17.     Since at least 2011, William Fleischer and/or Gritt Fleischer have served as the registered agents for Vail Run Resort Community Association.

18.     Since at least 2011, William Fleischer and/or Gritt Fleischer have served as the registered agents for Global Hospitality.

19.     Since at least 2011, William Fleischer and/or Gritt Fleischer have served as the registered agents for Fleischer Enterprises.

20.     Since at least 2011, the address for the registered agent of Vail Run Resort Community Association has been 1000 Lions Ridge Loop, Vail, Colorado, 81657.

21.      Since at least 2011, the address for the registered agent of Global Hospitality has been 1000 Lions Ridge Loop, Vail, Colorado, 81657.

22.     Since at least 2011, the address for the registered agent of Fleischer Enterprises has been 1000 Lions Ridge Loop, Vail, Colorado, 81657.

23.     Since at least 2011, Defendant Global Hospitality has paid the salary of William Fleischer.

24.     Since at least 2011, Defendant Global Hospitality has paid the salary of Alan McLean.

25.      In 2011 and 2012, during the duration of his employment at Vail Run Resort, Defendant Global Hospitality paid the salary of Omar Quezada.

26.     Since 2012, during the duration of her employment at Vail Run Resort, Defendant Global Hospitality paid the salary of Maria Ledezma (alias Marisa Flores).

27.    Since 2011, Defendant Vail Run Resort Community Association has paid the salaries of non-supervisory housekeeping employees, including Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and the other aggrieved individuals for whom EEOC seeks relief.

28.    When Omar Quezada worked at Vail Run Resort in 2011 and 2012, he determined the daily work assignments of the housekeeping staff.

29.    When Omar Quezada worked at Vail Run Resort in 2011 and 2012, he had the power to determine housekeeping staff's work schedules, including how many days an employee worked per week and when they would be scheduled to work.

30.    When Omar Quezada worked at Vail Run Resort in 2011 and 2012, he had the power to send home housekeeping employees early, without pay.

31.     When Omar Quezada worked at Vail Run Resort in 2011 and 2012, he had the power to discipline housekeeping employees.

32.    When Omar Quezada worked at Vail Run Resort in 2011 and 2012, he had the power to hire housekeeping employees.

33.    When Omar Quezada worked at Vail Run Resort in 2011 and 2012, he had the power to discharge housekeeping employees.

34.    When Omar Quezada worked at Vail Run Resort in 2011 and 2012, he was empowered to field and resolve employee workplace complaints.

35.     Since 2012, when Maria Ledezma began her employment at Vail Run Resort, she has determined the daily work assignments of the housekeeping staff.

36.     Since 2012, when Maria Ledezma began her employment at Vail Run Resort, she has had the power to determine housekeeping staff's work schedules, including how many days an employee worked per week and when they would be scheduled to work.

37.     Since 2012, when Maria Ledezma began her employment at Vail Run Resort, she has had the power to send home housekeeping employees early, without pay.

38.     Since 2012, when Maria Ledezma began her employment at Vail Run Resort, she has had the power to discipline housekeeping employees.

39.     Since 2012, when Maria Ledezma began her employment at Vail Run Resort, she has had the power to hire housekeeping employees.

40.     Since 2012, when Maria Ledezma began her employment at Vail Run Resort, she has had the power to discharge housekeeping employees.

41.     Since 2012, when Maria Ledezma began her employment at Vail Run Resort, she has been empowered to field and resolve employee workplace complaints.

42.     Since 2011, housekeepers at Vail Run Resort have been able to complain to William Fleischer or Alan McLean if they had a workplace problem.

43.     Since 2011, William Fleischer and Alan McLean have had the power to discipline, hire, and fire housekeeping staff.

44.     Since 2011, William Fleischer has had the power to discipline, hire, and fire housekeeping management, including Quezada and Ledezma.

45.     Since 2011, Alan McLean has had the power to discipline, hire, and fire housekeeping management, including Quezada and Ledezma.

46.     Since 2011, besides William Fleischer and Alan McLean, no other employee has had the power to discipline, hire, and fire housekeeping management for Vail Run Resort, including Quezada and Ledezma.

47.     Upon information and belief, since 2011, housekeeping staff employed by Defendant Vail Run Resort Community Association were made to work for Defendant Global Hospitality Resorts and/or Fleischer Enterprises in that they were required to clean other properties not owned by Defendant Vail Run Resort Community Association, including the Fleischers' private residence(s).

48.     Upon information and belief, since 2011, Defendants regularly shared employees, with housekeepers at Vail Run Resort performing work for both Defendants.

49.     Upon information and belief, since 2011, Defendants comingled assets by paying housekeeping employees from Defendant Vail Run Resort Community Association funds even when a housekeeper was not performing work for Defendant Vail Run Resort Community Association and was performing work at properties not owned by Defendant Vail Run Resort Community Association.

50.     Upon information and belief, since 2011, Defendants shared certain property, including transportation equipment and cleaning equipment.

51.     Since 2011, Defendant Vail Run Resort Community Association and Defendant Global Hospitality Resorts and/or Fleischer Enterprises have acted as a single integrated enterprise, alter-ego, and/or joint-employer.

## CONDITIONS PRECEDENT

52.     More than thirty days prior to the institution of this lawsuit Maria Luisa Baltazar Benitez and Maribel Soto Pérez filed charges with the Colorado Civil Rights Division ("CCRD") and the EEOC, alleging violations of Title VII by Defendant Vail Run Resort Community Association.

53.     Vail Run Resort received notice of the charges filed by Baltazar and Soto.

54.     First the CCRD and then the EEOC investigated the charges of discrimination.

55.     CCRD and EEOC each issued letters of determination to Vail Run Resort.

56.     The EEOC's letter of determination informed Defendants that EEOC found reasonable cause to believe that the Charging Parties and a class of Mexican women were subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964. EEOC also determined that Charging Parties and other individuals were subjected to retaliation in violation of Title VII.

57.     The Commission's determinations included an invitation for Defendants to join the Commission in informal methods of conference, conciliation, and persuasion in an attempt to eliminate and remedy the alleged unlawful employment practices.

58.     Defendants declined to participate in conciliation.

59.     All conditions precedent to the institution of this lawsuit have been fulfilled.

## GENERAL ALLEGATIONS

60.     Since at least August 2011, Defendants have engaged in unlawful employment practices in violation of Section 703(a)(l) of Title VII, 42 U.S.C. § 2000e-2(a)(l).

61.     On or about August of 2011, William Fleischer hired Omar Quezada as Housekeeping Manager at Vail Run Resort, a collection of 54 residential condominium properties and associated commercial properties.

62.     At the time Quezada was hired, Maria Luisa Baltazar Benitez, Maribel Soto Pérez, Sergio Carreón, Manuela Sinaloa Rascon, Yolanda Rodriguez, Rosa Fernandez, Olga Montes-Saenz, and Martina Ramirez-Arambula were all Mexican émigrés who were employed in the housekeeping department, as housekeeping or laundry, at Defendant Vail Run Resort Community Association's properties.

63.     When Fleischer hired Quezada, he allowed Quezada to move in to an on-premise condominium at a reduced rental price.

64.     Between August 2011 and August 2012, Quezada made sexual comments, jokes, and gestures to his subordinates, including, but not limited to:

a.     Quezada made sexual jokes, innuendoes, and sexual comments in front of the entire staff during breakfast and lunch breaks;

b.     Quezada commented about Soto's butt to Rodriguez;

c.     Quezada intentionally wore very tight shorts to work every day that would show off his penis;

d.     Quezada sent a messenger to Montes-Saenz to tell her that she was the "prettiest" girl at Vail Run, and that she was "sexy;"

e.     Montes-Saenz hid her pregnancy from Quezada for five months because Quezada had previously made remarks around another pregnant female employee that he "like[d] to have sex with pregnant women;"

f.     Quezada asked Montes-Saenz if she wore "Baby Dolls" lingerie, telling her that she would "look very sexy in Baby Dolls;"

g.      Quezada joked about sex with animals with Fernandez, describing how monkeys have sex, and making obscene hand and facial gestures;

h.      Quezada caressed Sinaloa's waist and lower abdomen;

i.      Quezada told Sinaloa that Montes-Saenz was "beautiful, and I wonder how she would look naked;"

j.      Quezada regularly talked about Baltazar's breasts and commented on her face;

k.      Quezada on multiple occasions chased Montes-Saenz and asked her out on dates;

l.      Quezada regularly berating Rodriguez and Fernandez with sexual jokes and comments;

m.      Quezada asked Montes-Saenz what color underwear she was wearing and what sexual positions she liked;

n.      Quezada showed Ramirez pictures with a woman in a bikini on his phone;

o.      Quezada would talk with Ramirez about having oral sex with other housekeeping employees;

p.      Quezada told Soto that "she knew what to do to get a promotion," meaning that she needed to give him sexual favors.

65.      As time went on, Quezada propositioned women, and became physically

aggressive, touching, grabbing, fondling, and assaulting women:

a.      Quezada asked Soto to come to his room to watch pornography.

b.      Quezada told Soto that if she had sex with him, he would make her a supervisor and buy her a car;

c.      Quezada told Soto she had to have sex with him if she wanted more hours;

d.      Quezada would regularly and aggressively chase the younger female workers;

e.      Quezada showed Sinaloa, Soto, Rodriguez, Baltazar, and others, pictures on his phone of what he contended was his penis, the butt of a scantily clad female he contended was his wife, and/or the vagina of a female, also claiming it was his wife;

10

f.      Quezada regularly stared at Montes-Saenz's butt when she was leaning over;

g.      After getting pizza with Quezada, Quezada asked Sinaloa to his room, started playing pornography, took off his clothes, kissed her, and asked her for sex, which she refused;

h.      Quezada came up behind Baltazar and grabbed her butt, rubbed his penis against her, and told her "look how hard I am";

i.      Quezada snuck into a unit that Baltazar was cleaning, closed the door, and removed all of his clothes. He came over and grabbed her pants off and unbuttoned her shirt. Baltazar told him to leave or she would call the police;

j.      Soto was depressed from having a miscarriage. When she came to ask for time off, Quezada grabbed and fondled her breasts in an elevator and told her that he was going to "take away her depression." Soto pushed Quezada out of the elevator when the door opened. He then exposed his penis to her.

66.     Unafraid to exploit his power as a manager and the unique vulnerabilities of a largely immigrant workforce, Quezada targeting Mexican women to sexually harass and retaliated against anyone who tried to refuse his advances or complain:

a.      Quezada demeaned Sinaloa, calling her an "Indian" all the time because she is an indigenous Mexican and less educated;

b.      When McLean purchased Thanksgiving turkeys for the employees, Quezada told McLean not to bother because "they don't eat turkey, they only eat beans. They aren't from here, "son ignorantes (they are ignorant)";

c.      Quezada told Fernandez that Vail Run hired him to "keep you guys in line" referring to the Mexican housekeeping staff and the needing to treat them rough. He would say "que se largan todos del housekeeping" (may Vail Run get all of housekeeping to go far away);

d.      If aggrieved individuals failed to laugh at his jokes, Quezada punished them by assigning them too many duties to complete in the work day;

e.      If aggrieved individuals refused his advances or threatened to complain, Quezada cut their hours, sent them home early without pay, or suspended them without pay. For example:

      i.   When Soto threatened to call the police on Quezada after he told her she needed to have sex with him to increase her hours and become a supervisor, he sent her home early without pay, and told her she was fired;

     ii.   Quezada suspended Montez-Saenz without pay because he thought she had complained about his conduct to management;

    iii.   Thrice when Montez-Saenz refused to go on a date with Quezada, he became angry and sent her home without pay for the remainder of the day;

f.   Quezada routinely called the Mexican housekeeping staff "ilegales" and derided them for not having papers;

g.   Quezada routinely threatened the aggrieved individuals with the police and deportation in order to procure submission to his sexual overtures or if they complained;

h.   Quezada regularly threatened to have Montez-Saenz, Rodriguez, Sinaloa and other Mexican women deported, shouting at them "son ilegales" and threatening that "I will call the immigration to come for you";

i.   Quezada threatened to call the police on Soto, Fernandez, and Rodriguez;

j.   Quezada repeatedly threatened Baltazar, telling her that he would call immigration on her whole family if she did not do what he wanted;

k.   Quezada told Soto that he was the manager, and he could do "whatever he wanted" and threatened to have her and her husband, Carreón, deported.

67.     Upon information and belief, the EEOC states that other Mexican female housekeeping employees were sexually harassed by Quezada in ways similar as those described above, and suffered from an unlawful hostile work environment while working for Defendants.

68.     Upon information and belief, the EEOC states that other housekeeping employees who engaged in protected activity or were associated with employees who engaged in protected activity were subjected to retaliation as described above and as described further herein the Complaint.

69.     On or about early 2012, Soto, Baltazar, Sinaloa, Carreón, Fernandez, Montes-Saenz, and other employees, with the use of an interpreter, had a meeting with Controller Alan McLean.

70.     At the meeting, the employees described for McLean what Quezada said about sex and female and male genitalia, and explained that female housekeepers were afraid of being cornered and groped by Quezada as they were cleaning rooms.

71.     The employees asked that Quezada be fired.

72.     In response, McLean shouted at the employees, telling them that they had no right to come to him and that Quezada was doing a fine job.

73.     McLean further stated that if anyone else had a complaint about Quezada, "the door was open for whoever did not like it."

74.     After the meeting, Defendants did not undertake an investigation of Quezada or implement any remedial or corrective measures.

75.     On April 21, 2012, Quezada sent Soto home early without pay after he propositioned her and she refused. Quezada also threatened to call the police on Soto.

76.     In turn, Soto complained to McLean of the sexual harassment and ordered him to call the police as she stood there.

77.     After she initiated this police complaint, Defendants put Soto on paid leave for two weeks, but took no action against Quezada.

78.     Defendants still did not undertake an investigation into Soto's complaint.

79.     Defendants did not discipline Quezada, or take any measures to reduce his supervisorial powers over the housekeeping staff.

13

80.     After Soto filed a police report against Quezada, Defendants began to retaliate against her husband Carreón:

     a.   Quezada drastically cut Carreón's regular work schedule.

     b.   Quezada threatened Carreón with physical violence.

     c.   Quezada regularly sent Carreón home without pay.

     d.   Quezada regularly berated and shouted at Carreón.

     e.   Quezada fired Carreón, and Carreón was only able to keep his job by threatening to report Quezada to McLean.

81.     On May 15, 2012, Defendants instituted a new policy that husbands and wives could not work in the same department, and selectively enforced it against Soto and Carreón.

82.     On May 16, 2012, Carreón and Soto again went to complain to McLean about Quezada. He told them "I can't fire you or him until the investigation is over."

83.     Defendants still did not undertake an investigation, take any disciplinary measures, or make any efforts to reduce Quezada's supervisorial powers over the housekeeping staff.

84.     On May 17, 2012, Vail Police Officer Russell Jacobs came to Vail Run Resort to interview witnesses.

85.     Officer Jacobs interviewed housekeeping staff as part of the police investigation, including Montez-Saenz and Sinaloa.

86.     Officer Jacobs later spoke with McLean and Fleischer, expressing his dismay that Quezada was continuing to supervise the housekeeping workforce.

14

87. Despite Officer Jacobs' concern, Defendants did not undertake an investigation, did not discipline Quezada or make any effort to reduce his supervisorial power over the housekeeping staff.

88. Upon her return from two week leave, Quezada continued to supervise Soto, maintaining complete power over her, including work assignments, scheduling, hours, and retaining the right to discipline and terminate her and Carreón.

89. In June 2012, the police arrested Quezada, who was in violation of a restraining order prohibiting Quezada from working directly with Soto.

90. Despite the arrest and restraining order, McLean and Fleischer still did not initiate an investigation, discipline Quezada, or reduce his management powers.

91. When Quezada returned to work at Vail Run Resort, although he communicated with Soto through an intermediary and worked different hours than her, he retained all his supervisorial powers over her.

92. Upon his return, Quezada continued to directly manage the rest of the housekeeping staff and continued to sexually harass them.

93. On August 22, 2012, Baltazar went to the Vail police and filed a complaint against Quezada.

94. Officer Jacobs interviewed Baltazar and obtained a warrant for Quezada's second arrest.

95. On August 24, 2012, Quezada was arrested for a second time in relation to the sexual harassment and retaliation at the crux of this case.

96.     The second restraining order against Quezada made it impossible for Quezada to keep working at Vail Run Resort Community Association.

97.     On the day Quezada resigned, William Fleischer told Quezada he was a "good employee and was likely set up" and suggested that anything Quezada may have done "was consensual."

98.     William Fleischer offered Quezada full-time employment for several months at one of his other properties.

99.     About one week after Quezada resigned, Defendants hired Ledezma as the new Housekeeping Manager.

100.    Ledezma told the housekeeping staff that she was hired by Fleischer and McLean to "clean house."

101.    When he hired her, William Fleischer told Ledezma that there were many problems in the housekeeping department, and that the problems had led to a lawsuit.

102.    Fleischer also asked Ledezma to split up a couple, that couple being Soto and Carreón.

103.    On October 3, 2012, approximately one month after Baltazar's police report against Quezada, Ledezma fired Baltazar.

104.    Baltazar had been employed by Defendants for five years and was one of the senior housekeepers at the time she was fired.

105.    Baltazar filed a charge of discrimination on January 3, 2013.

106.    On February 17, 2013, Ledezma and McLean presented Soto with a disciplinary letter that, *inter alia*, prohibited her from talking about Quezada and what he had done. When Soto refused to sign, they fired Soto and called the police on her.

107.    When the police came, Soto was with Carreón.

108.    McLean told Soto that she was terminated and needed to leave immediately. When Carreón demanded that she at least be paid the wages she was owed, McLean discharged and/or constructively discharged him, instructing the police to remove both Soto and Carreón from the premise.

109.    The police escorted both Soto and Carreón to the time clock and had them punch out, and then escorted the couple to their car and told them they needed to leave the premise or they would arrested.

110.    At this time, CCRD was already investigating Baltazar's charges.

111.    Defendants were on notice of the CCRD's investigation.

112.    On or about July 2013, during the CCRD investigation, William Fleischer stormed into Megan Bonta's office, a Catholic Charities representative who helped Baltazar file her CCRD charge. Fleischer threatened to have Catholic Charities' funding cut if Bonta did not stop helping with the case.

113.    Soto filed a charge of discrimination with the CCRD on April 29, 2013.

114.    During the CCRD's investigation, Defendants through Ledezma retaliated against aggrieved individuals who had engaged in protected activity (including refusing Quezada's advances, complaining to McLean, and/or speaking with the police and/or CCRD), or who were witnesses likely in favor of Soto and Baltazar.

115.    Defendants discharged Sinaloa and Fernandez on April 13, 2013.

116.    Defendants discharged and/or constructively discharging Montes-Saenz on or about May 2013, suspending her for three days without pay and implying that she and other employees would be soon fired.

117.    Along with the CCRD's investigation of Vail Run Resort Community Association, the District Attorney was prosecuting Quezada individually for criminal misconduct at Vail Run Resort.

118.    Defendants set Quezada up with an attorney, Brett Heckman, for the criminal defense.

119.    Heckman had previously performed legal work for Fleischer and Defendants.

120.    Defendant Vail Run Resort Community Association offered to pay Quezada's legal expenses.

121.    Initially, Defendants paid Heckman approximately $1,700.00 dollars in legal fees to defend Quezada.

122.    On November 21, 2013, an Eagle County jury found Quezada guilty of unlawful sexual contact and felony extortion toward Baltazar.

123.    During the trial, McLean testified in favor of Quezada, although Defendants never undertook an independent investigation into Quezada's conduct.

124.    After the guilty verdict, Quezada pled guilty to similar charges with respect to Soto.

125.   At all relevant times, Defendants had no employee handbook or written anti-harassment or anti-discrimination policies, and as of the first week of May 2015, continued not to have an employee handbook or any written anti-harassment or anti-discrimination policies.

126.   At all relevant times, Defendants provided no training on sexual harassment, discrimination, or retaliation to any of their managers or employees.

127.   The only "training" to this day that housekeeping employees have ever received about sexual harassment was from Quezada who told them they should not make false allegations of harassment and that several people had got in trouble in the past for making false allegations of harassment.

128.   At all relevant times, Defendants had no formal procedures for complaining about sexual harassment, discrimination, or harassment.

129.   At all relevant times, no information or training was provided to Defendants' housekeeping employees about how to complain if they had a problem with sexual harassment or discrimination, particularly if it was their manager who was engaged in the harassment.

<u>**FIRST CLAIM FOR RELIEF**</u>
**[Sex Harassment/Hostile Work Environment Because of Sex - 42 U.S.C. §§ 2000e-2(a) and 2000e-5(f)(1)]**

130.   The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

131.   In 2011 and 2012, Defendants discriminated against Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other female employees in violation of section 703(a) of Title VII, 42 U.S.C. §2000e-2(a), by subjecting them to sexual harassment, and by creating and tolerating a sexually hostile work environment.

19

132.    The offensive sexual conduct described in the preceding paragraphs was sufficiently severe or pervasive to alter the terms and conditions of employment for Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other female employees.

133.    The sexual harassment and hostile work environment to which Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other female employees were subjected was perpetrated by one of Defendants' employees with direct supervisory authority over the aforementioned female employees and occurred on a frequent and routine basis over a substantial period of time.

134.    Defendants knew or should have known of the sexually hostile work environment because Defendants' supervisors and managers observed it, because the harassment was frequent and notorious in nature, and/or because Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals complained about it.

135.    Defendants failed to take prompt or effective action to prevent, correct or remedy the sexually hostile work environment.

136.    The effect of the practices complained of above has been to deprive Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other female employees of equal employment opportunities, and otherwise adversely affect their status as employees, because of their sex.

137.    The unlawful employment practices complained of above were intentional.

138.    The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved female employees.

139.    As a result of the events and actions described above, Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved female employees have been deprived of equal employment opportunities, experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, and were and are otherwise adversely affected because of their sex.

### SECOND CLAIM FOR RELIEF

**[Hostile Work Environment Because of National Origin -- 42 U.S.C. §§ 2000e-2(a) and 2000e-5(f)(1)]**

**140.**    The allegations contained in the foregoing paragraphs are incorporated by reference.

141.    In 2011 and 2012, Defendants discriminated against Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other female Mexican employees in violation of section 703(a) of Title VII, 42 U.S.C. §2000e-2(a), by subjecting them to a hostile work environment, including sexual harassment and extortion, because of their national origin, Mexican, and by creating and tolerating a hostile work environment because of their national origin, Mexican.

142.    The offensive hostile work environment described in the preceding paragraphs was sufficiently severe or pervasive to alter the terms and conditions of employment for Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other female Mexican employees.

143.    The hostile work environment to which Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other female Mexican employees were subjected was perpetrated by one of Defendants' employees with direct supervisory authority over the aforementioned Mexican female employees and occurred on a frequent and routine basis over a substantial period of time.

144.    Defendants knew or should have known of the hostile work environment because Defendants' supervisors and managers observed it, because the harassment was frequent and notorious in nature, and/or because Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals complained about it.

145.    Defendants failed to take prompt or effective action to prevent, correct or remedy the hostile work environment Mexican female employees were subjected to.

146.    The effect of the practices complained of above has been to deprive Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other Mexican female employees of equal employment opportunities, and otherwise adversely affect their status as employees, because of their national origin, Mexican.

147.    The unlawful employment practices complained of above were intentional.

148.    The unlawful employment practices complained of above were done with malice or reckless indifference to the federally protected rights of Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved Mexican female employees.

149.    As a result of the events and actions described above, Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved Mexican female employees have been deprived of equal employment opportunities, experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, and were and are otherwise adversely affected because of their national origin.

## THIRD CLAIM FOR RELIEF
### [Retaliation - 42 U.S.C. § 2000e-3(a)]

150.    The allegations contained in the foregoing paragraphs are hereby incorporated by reference.

151.    Defendants engaged in unlawful employment practices in the State of Colorado, in violation of Section 704 of Title VII, 42 U.S.C. § 2000e-3(a), by retaliating against Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved employees, of both male and female sex.

152.    Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals engaged in protected activity within the meaning of §704 of Title VII, 42 U.S.C. §2000e-4(a), by opposing what they reasonably believed was an unlawful discriminatory employment practice based on sex and/or national origin and/or by filing charges, testifying, assisting, or participating in investigation, proceeding, or hearing, and/or by being associated with someone who did engaged in one or more of these protected activities.

153.    Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals, *inter alia*, refused Quezada's advances, complained to McLean, filed charges with the police, CCRD, and EEOC, participated in the police and federal agencies' investigations into Defendants conduct, and helped with the prosecution of Quezada, and/or were related to individuals who engaged in these activities.

154.    Defendants did not take appropriate action in response to complaints by Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals.

155.    Instead, Defendants retaliated against Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals.

156.    Defendants, acting through their managers and supervisors, retaliated against Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals by allowing the sex-based and national-origin based hostile work environment caused by Quezada to continue; by allowing Quezada to exploit his supervisorial power and adversely affect the aggrieved individuals' work environment, assignments, schedules, hours, and pay; and by discharging and/or constructively discharging Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals.

157.    The effect of the practices complained of in the forgoing paragraphs has been to deprive Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals of equal employment opportunities and otherwise adversely affect their status as employees, because they engaged in protected activity.

158.    The unlawful employment practices complained of in the foregoing paragraphs were intentional.

159.    The unlawful employment practices complained of above were done with malice or with reckless indifference to the federally protected rights of Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals by the retaliatory practices.

160.    As a result of the events and actions described above, Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals have been deprived of equal employment opportunities, experienced emotional pain, suffering, inconvenience, loss of

enjoyment of life, and humiliation, and were and are otherwise adversely affected because of Defendant's unlawful retaliation.

## PRAYER FOR RELIEF

Wherefore, the Commission respectfully requests that this Court:

A. Grant a permanent injunction enjoining Defendants, their officers, successors, assigns and all persons in active concert or participation with them, from engaging in any employment practice which discriminates on the basis of sex and/or national origin, and from retaliating against employees who oppose such discrimination.

B. Order Defendants to institute and carry out policies, practices and programs which provide equal employment opportunities for all employees, including women and Mexican immigrants, and which eradicate the effects of its past and present unlawful employment practices.

C. Order Defendants to make whole Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and a class of other aggrieved individuals by providing backpay and lost benefits with prejudgment interest, where appropriate, and other affirmative and equitable relief necessary to eradicate the effects of its unlawful employment practices, including but not limited to, reinstatement or front pay, where appropriate, in amounts to be determined at trial.

D. Order Defendants to make whole Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and a class of other aggrieved individuals by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices complained of in the paragraphs above, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial.

E. Order Defendants to pay Maria Luisa Baltazar Benitez, Maribel Soto Pérez, and other aggrieved individuals punitive damages for Defendants' intentional and/or malicious and/or reckless conduct described in the paragraphs above, in amounts to be determined at trial.

F. Grant such further relief as the Court deems necessary and proper.

G. Award the Commission its costs in this action.

## JURY TRIAL DEMAND

The Commission requests a jury trial on all questions of fact raised by its Complaint.

RESPECTFULLY SUBMITTED this 27th day of July, 2015.

P. David Lopez
General Counsel

Gwendolyn Reams
Associate General Counsel

Mary Jo O'Neill
Regional Attorney
Phoenix District Office

Sean Ratliff
Supervisory Trial Attorney
Denver Field Office

*/s/ Iris Halpern*
Iris Halpern
Lead Trial Attorney
Denver Field Office
Telephone: 303-866-1374
Email: iris.halpern@eeoc.gov

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Denver District Office